## UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

MAKALA HAMMONDS                         Case No. 1:17-cv-100
     Plaintiff,                         Dlott, J.
                                        Litkovitz, M.J.

     vs.


COMMISSIONER OF                         **REPORT AND**
SOCIAL SECURITY,                        **RECOMMENDATION**
     Defendant.


Plaintiff brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner of Social Security (Commissioner) denying plaintiff's application for children's Supplemental Security Income (SSI), which converted to adult disability benefits after plaintiff turned eighteen. This matter is before the Court on plaintiff's Statement of Errors (Doc. 11), the Commissioner's response in opposition (Doc. 12), and plaintiff's reply (Doc. 15).

## I. Procedural Background

Plaintiff's mother filed an application for children's SSI benefits on plaintiff's behalf in January 2013, alleging disability since December 1, 2010 due to epilepsy, a stroke, bad nerves, a learning disability, and a cyst on her brain. Plaintiff's application was denied initially and upon reconsideration. Plaintiff requested and was granted a *de novo* hearing before an administrative law judge (ALJ). Plaintiff turned eighteen years old in March 2014. A hearing was held before ALJ Thuy-Anh T. Nguyen on October 8, 2015. Plaintiff, plaintiff's mother, plaintiff's grandmother, and a vocational expert ("VE") appeared and testified at the ALJ hearing. On December 21, 2015, the ALJ issued a decision denying plaintiff's SSI application. Plaintiff's request for review by the Appeals Council was denied, making the decision of the ALJ the final administrative decision of the Commissioner.

**II.  Analysis**

>   **A.  Legal Framework for Disability Determinations**

>   >   **i.  Childhood Disability**

To qualify for SSI as a child under the age of 18, a plaintiff must file an application and be an "eligible individual" as defined in the Act.  42 U.S.C. § 1382(a); 20 C.F.R. § 416.202. Eligibility is dependent upon disability, income, and other financial resources.  *Id*.  An individual under the age of 18 is considered disabled for purposes of SSI "if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 1382c(a)(3)(C)(i).

The Social Security regulations set forth a three-step sequential analysis for determining whether a child is disabled for purposes of children's SSI benefits:

>   1. Is the child is engaged in any substantial gainful activity?  If so, benefits are denied.

>   2. Does the child have a medically severe impairment or combination of impairments?  If not, benefits are denied.

>   3. Does the child's impairment meet, medically equal, or functionally equal any in the Listing of Impairments, Appendix I of 20 C.F.R. pt. 404, subpt. P. 20 C.F.R. § 416.924(a)?  If so, benefits are granted.

20 C.F.R. § 416.924(a)-(d).

If an impairment does not meet a listed impairment, disability may nonetheless be established if the child's impairment is medically or functionally equivalent to a listed impairment.  A child's impairment is "medically equivalent" to a listed impairment if it is "at least equal in severity and duration to the criteria" of a listed impairment.  20 C.F.R. § 416.926.

2

In determining whether a child's impairment(s) functionally equals the listings, the adjudicator must assess the child's functioning in six domains:

1. Acquiring and using information;

2. Attending and completing tasks;

3. Interacting and relating with others;

4. Moving about and manipulating objects;

5. Caring for yourself; and

6. Health and physical well-being.

20 C.F.R. § 416.926a(b)(1)(i)-(vi).  To functionally equal an impairment in the listings, an impairment must result in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain.  20 C.F.R. § 416.926a(d).  The relevant factors that will be considered in making this evaluation are (1) how well the child initiates and sustains activities, how much extra help she needs, and the effects of structured or supportive settings; (2) how the child functions in school; and (3) the effects of the child's medications or other treatment.  20 C.F.R. § 416.926a(a)(1)-(3).

An individual has a "marked" limitation when the impairment "interferes seriously with [the] ability to independently initiate, sustain, or complete activities."  20 C.F.R. § 416.926a(e)(2)(i).  A "marked" limitation is one that is "more than moderate" but "less than extreme."  *Id.*  An "extreme" limitation exists when the impairment "interferes very seriously with [the] ability to independently initiate, sustain, or complete activities."  20 C.F.R. § 416.926a(e)(3)(i).  Day-to-day functioning may be "very seriously limited" when only one activity is limited by the impairment or when several activities are limited by the impairment's cumulative effects.  *Id.*

3

If the child's impairment meets, medically equals, or functionally equals an impairment in the listings, and if the impairment satisfies the Act's duration requirement, then the child is considered disabled. 20 C.F.R. § 416.924(d)(1). If both of these requirements are not satisfied, then the child is not considered disabled. 20 C.F.R. § 416.924(d)(2).

### ii. Adult Disability

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(A). The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. § 1382c(a)(3)(B).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

> 1) If the claimant is doing substantial gainful activity, the claimant is not disabled.
>
> 2) If the claimant does not have a severe medically determinable physical or mental impairment – *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities – the claimant is not disabled.
>
> 3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.
>
> 4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.
>
> 5) If the claimant can make an adjustment to other work, the claimant is not disabled. If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.,* 582 F.3d 647, 652 (6th Cir. 2009) (citing 20 C.F.R. §§

416.920(a)(4)(i)-(v), 416.920 (b)-(g)).  The claimant has the burden of proof at the first four

steps of the sequential evaluation process.  *Id.*; *Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 548

(6th Cir. 2004).  Once the claimant establishes a prima facie case by showing an inability to

perform the relevant previous employment, the burden shifts to the Commissioner to show that

the claimant can perform other substantial gainful employment and that such employment exists

in the national economy.  *Rabbers,* 582 F.3d at 652; *Harmon v. Apfel,* 168 F.3d 289, 291 (6th

Cir. 1999).

### B.  The Administrative Law Judge's Findings

The ALJ applied the sequential evaluation process under both child and adult disability

standards and made the following findings of fact and conclusions of law:

> 1. The [plaintiff] was born [in] . . . 1996 and was therefore in the "Adolescents (age 12 to attainment of age 18)" age group on January 14, 2013, the date the application was filed (e.g., 20 CFR 416.926a(g)(2)(v)).  The [plaintiff] attained age 18 [in] . . . 2014 (20 CFR 416.120(c)(4)).

> 2. The [plaintiff] has not engaged in substantial gainful activity since the date the application was filed (20 CFR 416.924(b) and 416.972).

> 3. Before attaining age 18, the [plaintiff] had the following severe impairments: epilepsy, borderline intellectual functioning (BID), and attention deficiency disorder (ADD)/attention deficiency hyperactivity disorder (ADHD) (20 CFR 416.924(c)).

> 4. Before attaining age 18, the [plaintiff] did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR 404, Subpart P, Appendix 1, Part A or B (20 CFR 416.920(d), 416.924, 416.925 and 416.926).

> 5. Before attaining age 18, the [plaintiff] did not have an impairment or combination of impairments that functionally equaled the listings (20 CFR 416.924(d) and 416.926a).

> 6. Because the [plaintiff] did not have an impairment or combination of impairments that met, medically equaled any listing or functionally equaled the listings, the [plaintiff] was not disabled prior to attaining age 18 (20 CFR 416.924(a)).

> 7. The [plaintiff] has not developed any new impairment or impairments since attaining age 18.

8. Since attaining age 18, the [plaintiff] has continued to have a severe impairment or combination of impairments (20 CFR 416.920(c)).

9. Since attaining age 18, the [plaintiff] has not had an impairment or combination of impairments that meets or medically equals a listed impairment (20 CFR 416.920(d)).

10. After careful consideration of the entire record, the [ALJ] finds that the [plaintiff] has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: The [plaintiff] can occasionally climb ramps and stairs but can never climb ladders, ropes, or scaffolds.  The [plaintiff] cannot be exposed to unprotected heights or hazardous machinery.  The [plaintiff] is limited to simple, routine, repetitive tasks and low stress jobs as defined as occasional decision making and occasional changes in work setting.  The [plaintiff] can have occasional interaction with public, coworkers, and supervisors.  The [plaintiff] will be off task 10% of workday.  The [plaintiff] cannot perform jobs that require reading greater than a third grade level.

11. The [plaintiff] has no past relevant work (20 CFR 416.965).

12. The [plaintiff] is currently a "younger individual age 18-44" (20 CFR 416.963).

13. The [plaintiff] has at least a high school education and is able to communicate in English (20 CFR 416.964).

14. Transferability of job skills is not an issue because the [plaintiff] does not have past relevant work (20 CFR 416.968).

15. Since attaining age 18, considering the [plaintiff]'s age, education, work experience, and residual functional capacity, jobs have existed in significant numbers in the national economy that the [plaintiff] has been able to perform (20 CFR 416.960(c) and 416.966).[1]

16. The [plaintiff] has not been under a disability, as defined in the Social Security Act, since March 25, 2014, the day the [plaintiff] attained age 18, through the date of this decision (20 CFR 416.924(a) and 416.920(g)).

(Tr. 18-34).

In determining that plaintiff's impairments were not functionally equivalent to a listed

impairment, the ALJ found:

---

[1] The ALJ relied on the VE's testimony to find that plaintiff would be able to perform the requirements of representative light, unskilled jobs such as cleaner (250,000 jobs nationally), packager (34,000 jobs nationally), and label inspector (62,000 jobs nationally).  (Tr. 34, 80-81).

1. Before attaining age 18, the [plaintiff] had less than marked limitation in acquiring and using information. (Tr. 23-24).

2. Before attaining age 18, the [plaintiff] had less than marked limitation in attending and completing tasks. (Tr. 24-25).

3. Before attaining age 18, the [plaintiff] had less than marked limitation in interacting and relating to others. (Tr. 25-26).

4. Before attaining age 18, the [plaintiff] had no limitation in moving about and manipulating objects as a result of her impairments. (Tr. 26-27).

5. Before attaining age 18, the [plaintiff] had less than marked limitation in the ability to care for herself as a result of her impairments. (Tr. 27-28).

6. Before attaining age 18, the [plaintiff] had less than marked limitation in health and physical well-being. (Tr. 28-29).

## C.  Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence, and (2) whether the ALJ applied the correct legal standards.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).  Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).  In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole.  *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination.  Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right."  *Rabbers,* 582 F.3d at 651 (quoting *Bowen,* 478 F.3d at 746). *See also Wilson*, 378 F.3d at 545-46 (reversal required even though ALJ's decision was otherwise supported by substantial evidence where ALJ failed to give good reasons for not giving weight to treating physician's opinion, thereby violating the agency's own regulations).

**D. Medical Evidence**

### *i. Medical records*

In the fall of 2003/winter of 2004 when she was seven years old, plaintiff underwent a multi-day psychological evaluation conducted by two psychologists at Children's Hospital in Columbus, Ohio, Dr. Patty Lanthrob, Ph.D., and Dr. Lynda Wolfe, Ph.D., to assess issues of attention deficit hyperactivity disorder (ADHD), as well as cognitive functioning.  (Tr. 288-92). At that time, plaintiff had difficulty learning new material, understanding directions, and focusing.  (Tr. 288).  Plaintiff's teachers expressed these issues to her parents soon after she started kindergarten.  (*Id.*).  Drs. Lanthrob and Wolfe assessed plaintiff's functioning to be in the low average range of intelligence as measured by the Wechsler Intelligence Test for Children-Third Edition (WISC-III), with a full scale IQ of 87, a Verbal IQ of 92, and a Performance IQ of 84.  (Tr. 290, 293).  Drs. Lanthrob and Wolfe noted that plaintiff had difficulty expressing herself clearly and using correct words.  (Tr. 291).  Plaintiff was also found to have poor vocabulary skills, affected by anxiety.  (*Id.*).  Drs. Lantrhob and Wolfe concluded that plaintiff met the criteria for ADHD-Primarily Inattentive Type.  (*Id.*).  They recommended that plaintiff

be assessed by a speech and language pathologist to address both receptive and expressive language skills and noted that "it is clear that [plaintiff] often has difficulty understanding directions." (*Id.*). They also recommended that plaintiff be assessed by an occupational therapist regarding her fine motor skills and her hand muscles tiring easily. (Tr. 292). Drs. Lanthrob and Wolfe further recommended that plaintiff's parents request a medical consultation with her physician. (*Id.*). They also recommended that accommodations be made at both school and home to assist with her inattention. (*Id.*).

In February 2011 at the age of fourteen, plaintiff visited the emergency room at the Southern Ohio Medical Center and her father reported that she was having "spells," which he believed to be seizures. (Tr. 311-13). On February 28, 2011, plaintiff had an MRI of the brain due to her clinical history of epilepsy and her left side of the body being larger than the right. (Tr. 346-47). The MRI showed a small patchy of abnormal appearing white matter in the left periatrial region that appeared to be associated with a small group of Virchow-Robin spaces and a small arachnid cyst within the left middle cranial fossa. (Tr. 347). Deborah Terry, APN, at Nationwide Children's Hospital prescribed Trileptal in February 2011 and plaintiff reported having no further seizures. (Tr. 348-49, 405-07).

At age sixteen, plaintiff underwent a neuropsychological evaluation on February 26, 2013 with Dr. Doug Bodin, Ph.D., ABPP/CN, at Nationwide Children's Hospital to document her neuropsychological functioning and assist with clinical management. (Tr. 339-43). Dr. Bodin noted that plaintiff had a history of epilepsy, as well as developmental delays and anxiety. (Tr. 339). During the evaluation, plaintiff interacted minimally with examiners and her attention and activity level were well-regulated in the structured one-on-one testing environment. (Tr. 340). She was cooperative during testing, but gave up easily on difficult items. (*Id.*). Her

9

comprehension was intact and her speech was well-articulated.  (*Id.*).  Plaintiff's general

cognitive ability was far below average, with a full scale IQ score of 59 and a verbal score of 63

on the WAIS-IV.  (*Id.*).  Dr. Bodin noted that plaintiff's verbal learning and memory were

impaired.  (*Id.*).  Her rate of learning, recall and recognition, and narrative memory were all

below average.  (*Id.*).  Plaintiff's spatial judgment was also far below average.  (Tr. 341).  Dr.

Bodin concluded that plaintiff's "neuropsychological protocol highlights mild to moderate global

impairments extending across verbal and nonverbal functions, as well as fine motor skills."  (*Id.*).

Dr. Bodin opined that the results of the evaluation suggested diffuse cerebral impairment.  (*Id.*).

Dr. Bodin diagnosed mild intellectual disability (previously referred to as mild mental

retardation).  Other diagnostic considerations within that context included generalized anxiety

disorder and depression.  (Tr. 342).  In classroom and vocational settings, Dr. Bodin opined that

plaintiff would benefit from frequent verbal and written reminders, would need extra time to

complete tasks, and would perform best in highly structured settings.  (*Id.*).  Dr. Bodin

encouraged plaintiff's parents to urge her to complete more tasks for herself and accept increased

responsibility for self-care and daily living tasks.  (*Id.*).

On March 18, 2015, at age eighteen, plaintiff visited Dr. Kandamurugu Manikam, M.D.,

in the Genetics Clinic at Nationwide Children's Hospital for an ongoing evaluation of seizure

disorder, asymmetry, and mild intellectual disability.  (Tr. 425-29).  Dr. Manikam assessed

plaintiff with ". . . unusual features of asymmetry polydactyly and venous malformations of the

brain and skin."  (Tr. 428).  Dr. Manikam further opined that "[s]ome of her features could be

consistent with PIK3CA somatic mutation associated with MCAP (Magalencephaly-Capillary

Malformation) or CLOVES (Congenital Lipomatous Overgrowth, Vascular Malformations, and

Epidermal Nevi) and Fibrodipose Hyperlasia (FH)."  (*Id.*).  Dr. Manikam recommended a skin

biopsy to confirm the diagnosis. As of September 2015, plaintiff had not yet undergone the biopsy because she was "very reluctant." (Tr. 421).

   ii. *Education records*

  In 2004, when plaintiff was eight years old, educators at Portsmouth West Elementary School completed an Evaluation Team Report (ETR) summarizing plaintiff's educational concerns and need for special education services. (Tr. 294-308). The report indicated that instructions often had to be repeated many times to plaintiff and she needed extra assistance to complete work. (Tr. 302). The report noted that plaintiff had trouble staying focused at times. (*Id.*). Plaintiff read at a third grade level, but she had difficulties retrieving previous learned materials and needed questions or instructions to be reworded. (Tr. 303). Plaintiff had oral reading skills at the second to fourth grade levels, spelling skills at the fourth grade level, math skills at the first and second grade levels, and sentence writing skills at the third grade level. (Tr. 304). Even though the actual IQ test results were not included in the report, the report indicates that "[i]n general [plaintiff's] intelligence scores and achievement scores were within reasonable concordance." (Tr. 305). The evaluation team concluded that plaintiff's achievement was on expectancy with intelligence results. (Tr. 307). The team noted that plaintiff had a number of surgeries and health concerns that may have contributed to some of her learning issues. (*Id.*). The team also noted that plaintiff had "attention disorder," which could account for classroom learning problems. (*Id.*). It was further noted that plaintiff sometimes got upset emotionally and gave up, which compounded her classroom issues. (*Id.*). The evaluation team recommended plaintiff for a speech and language assessment, occupational therapist screening, medical consult for inattention, accommodations for ADHD at home and school, and individual therapy to help her severe issues with worries, self-esteem, and coping skills. (*Id.*).

Two of plaintiff's Individualized Education Plans (IEPs) from high school are also included in the administrative record.  (Tr. 187-205, 236-251).  On April 17, 2012, plaintiff's results from the Woodcock-Johnson III Normative Update Test of Achievement indicated that, at age sixteen, plaintiff's fluency with academic tasks was within the average range.  (Tr. 188).  Her academic skills were in the low average range and her ability to apply academic skills was within the low range.  (*Id.*).  Plaintiff's reading fluency skills were at the ninth grade level and her math fluency skills were at the third grade level.  (*Id.*).

When plaintiff was seventeen years old and in 12th grade, her IEP indicated that she enrolled in the Allied Health program at Scioto County Career Center.  (Tr. 236).  Plaintiff expressed a desire to seek employment in the medical field.  (*Id.*).  Plaintiff was able to navigate the academic and vocational curriculum in the Allied Health program with minimal assistance. (Tr. 240).  Plaintiff was capable of living independently and seeking and maintaining employment.  (Tr. 236).  The IEP also indicates that plaintiff's needs and weaknesses were addressed through the extension of deadlines and exams.  (*Id.*).  Plaintiff worked well independently and in groups, and was motivated, communicated effectively, and was compliant with classroom rules.  (*Id.*).  Her reading fluency skills were below grade level, but she had increased word recognition and comprehension through instructor and tutor assistance.  (*Id.*). Plaintiff did not pass any of her Ohio Graduation Tests.  (Tr. 240).

### iii. *Medical opinions*

State agency psychologist, Dr. Leslie Rudy, Ph.D., and state agency reviewing pediatrician, Dr. Frank Stroebel, M.D., reviewed plaintiff's file in April and May 2013 under the functional domains in determining childhood disability.  (Tr. 85-93).  Drs. Rudy and Stroebel found that plaintiff had no limitations in the domain of moving about and manipulating objects;

and less than marked limitations in the domains of acquiring and using information, attending and completing tasks, interacting and relating with others, caring for oneself, and health and physical well-being. (Tr. 89-90). Drs. Rudy and Stroebel noted that plaintiff's IQ score of 59 from 2013 appeared to be invalid and inconsistent with plaintiff's school records and achievement testing scores. (Tr. 89). Drs. Rudy and Stroebel also discounted the IQ score based on Dr. Bodin's examination note that plaintiff was "cooperative with testing but gave up easily." (*Id.*). State agency psychologist, Dr. Deryck Richardson, Ph.D., and pediatrician, Dr. Malika Haque, M.D., reviewed plaintiff's file for reconsideration purposes in January 2013. Drs. Richardson and Haque affirmed the assessment of Drs. Rudy and Stroebel. (Tr. 95-106).

### D. Specific Errors

Plaintiff alleges the following assignments of error: (1) the ALJ erred in determining that her impairments did not meet or medically equal Listings 12.05(B) and 112.05(C); (2) the ALJ erred in finding that she had less than marked limitations in all six domains pursuant to 20 C.F.R. § 416.926a; (3) the ALJ erred in refusing to order additional expert testimony or a consultative examination; and (4) the ALJ erred in weighing the medical opinions of record. (Doc. 11).

### 1. Whether the ALJ erred in finding that plaintiff's impairments did not meet or medically equal Listings 12.05(B) and 112.05(C)

Plaintiff argues that the ALJ failed to adequately consider her IQ score of 59 in determining whether she met Listings 12.05(B) and 112.05(C). (Doc. 11 at 4-5). Plaintiff argues that the ALJ erred in concluding that her IQ score, as recorded by Dr. Bodin in March 2013, was inconsistent with her performance in other tests. (*Id.* at 5). Plaintiff argues that her IQ score is consistent with other test results in the record. (*Id.* at 5-6). Plaintiff argues that the ALJ erred in agreeing with the state agency consultants that her IQ score from Dr. Bodin should be

13

questioned.  (*Id.* at 6).  Plaintiff also argues that the ALJ erred in considering her full scale IQ score of 92 from March 2004 because it is not "sufficiently current for accurate assessment under 112.05."  (*Id.*) (citing introductory paragraphs to Listing 112.05(D)(10)).  Plaintiff also points out that the school records in the file on which the ALJ relies were not completed by acceptable medical sources such as a school psychologist or clinical psychologist.  (*Id.* at 7).  Plaintiff also contends that the record contains evidence of deficits in adaptive functioning.  (*Id.*).  Plaintiff contends that the ALJ ignored many of the references in her IEPs that relate to her low intellectual functioning.  (*Id.* at 8, citing Tr. 188, 211-14, 238, 248, 196-97, 199).

In response, the Commissioner argues that the ALJ reasonably found that plaintiff did not meet or medically equal Listing 12.05(B) or 112.05(C).  (Doc. 12 at 4).  The Commissioner contends that the ALJ reasonably found that the IQ score of 59 recorded by Dr. Bodin was inconsistent with the other evidence of record, including other test results, the limitations in plaintiff's IEPs, and her ability to function in a regular classroom and pass high school.  (*Id.* at 5, 8-9).  The Commissioner cites to evidence in the record demonstrating that the IQ score of 59 is not supported and that the ALJ adequately explained its inconsistency.  (*Id.* at 8-9).  The Commissioner argues that the ALJ reasonably gave "great weight" to the opinions of the state agency reviewing psychologists, who questioned the IQ score of 59 recorded by Dr. Bodin.  (*Id.* at 5).

"Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22."  20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.05.  *See also id.* § 112.05.

14

The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

    A.  Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded;

    B.  A valid verbal, performance, or full scale IQ of 59 or less;

    C.  A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;

    D.  A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:

        1.  Marked restriction of activities of daily living; or

        2.  Marked difficulties in maintaining social functioning; or

        3.  Marked difficulties in maintaining concentration, persistence, or pace; or

        4.  Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.05. *See also id.* § 112.05.[2]

---

[2] Listing 112.05, the listing for intellectual disability for children under 18, provides in part:

    **Intellectual disability**: Characterized by significantly subaverage general intellectual functioning with deficits in adaptive functioning.

    The required level of severity for this disorder is met when the [following] requirements . . . are satisfied.
    . . . .
    C. A valid verbal, performance, or full scale IQ of 59 or less; or

    D. A valid verbal, performance, or full scale IQ of 60 through 70, and a physical or other mental impairment imposing an additional and significant limitation of function. . . .

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.05C, D.

The ALJ determined that before attaining age 18 and since attaining age 18, plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments contained in the regulations. (Tr. 18, 29). In considering plaintiff's full scale IQ score of 59 from February 2013, the ALJ concluded that the score's validity is "not consistent with the [plaintiff]'s performance in other tests, including performance scores recorded in her IEPs." (Tr. 19, citing Tr. 188, 238). Specifically, the ALJ noted that test results from October 2012 and January 2013 showed that plaintiff had reading skills at the sixth grade level and math skills at the fourth grade level. (*Id.*, citing Tr. 238). The ALJ also noted that the IQ score was not consistent with the fairly limited accommodations in plaintiff's IEPs. (*Id.*, citing Tr. 196-97, 199, 242-43). The ALJ noted that plaintiff did not receive "significantly different curricula or classroom settings" and she graduated high school in 2014. (*Id.*).

The undersigned concludes the ALJ's determination that plaintiff does not meet or equal Listings 112.05(C) and 12.05(B) is supported by substantial evidence. For purposes of Listings 12.05 and 112.05, the Social Security regulations direct that the lowest score of an IQ test's multiple components be used: "[W]here verbal, performance and full scale IQs are provided in the Wechsler series, we use the lowest of these in conjunction with 12.05." 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.00(D)(6)(c). *See also id.* § 112.00(D)(9). A good IQ test should exhibit "reliability, i.e., the consistency of results obtained over time with the same test and the same individual." 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.00(D)(5)(c). *See also id.* § 112.00(D)(8). "IQ test results must also be sufficiently current for accurate assessment." 20 C.F.R. Part 404, Subpart P, Appendix 1, § 112.00(D)(10). The regulations explain:

> Generally, the results of IQ tests tend to stabilize by the age of 16. Therefore, IQ test results obtained at age 16 or older should be viewed as a valid indication of the child's current status, *provided* they are compatible with the child's current

16

> behavior.  IQ test results obtained between ages 7 and 16 should be considered
> current for 4 years when the tested IQ is less than 40, and for 2 years when the IQ
> is 40 or above.

*Id.* (emphasis added).  "Test results obtained at younger ages are less reliable and valid than test results obtained at older ages."  POMS § DI 24515.055(A).

Here, the record reveals that plaintiff's IQ was tested on two occasions.  First, in 2004 when plaintiff was seven years old, she received a verbal score of 92, a performance score of 84, and a full-scale score of 87 on the Wechsler Intelligence Test for Children ("WISC-III").  (Tr. 290, 293).  Second, in 2013 when plaintiff was sixteen years old and underwent an evaluation conducted by Dr. Bodin, she received a verbal score of 63 and a full-scale score of 59 on the Wechsler Adult Intelligence Scale ("WAIS-IV").  (Tr. 340).

In this case, the ALJ focused on plaintiff's IQ score from 2013 to find that plaintiff did not meet the listings.  The ALJ properly relied on other test results conducted around the same time and thoroughly reviewed the record to find that plaintiff's IQ score of 59 was invalid and inconsistent with the record.  *See Jones v. Comm'r of Soc. Sec.*, No. 08-cv-562, 2009 WL 3498809, at *6 (W.D. Mich. Oct. 26, 2009) ("a valid IQ score need not be conclusive of [intellectual disability], where the IQ score is inconsistent with other evidence of [sic] in the record concerning the [plaintiff]'s daily activities and behaviors") (internal citations omitted). *See also Barnett ex rel. D.B. v. Comm'r of Soc. Sec.*, 573 F. App'x 461, 463-64 (6th Cir. 2014) ("[t]he regulations make clear that, when 'considering the validity of a test result, [the ALJ] should note and resolve any discrepancies between formal test results and the child's customary behavior. . . .'" (citing 20 C.F.R. Pt. 404, Subpt. P., App. 1, § 112.00(D)(8)).

For example, plaintiff's performance on the Woodcock-Johnson III Achievement test administered in April 2012 when plaintiff was sixteen, revealed that her fluency with academic

17

tasks was within the average range and her academic skills and ability to apply academic skills were within the low range. (Plaintiff's 2012 IEP, Tr. 188). Plaintiff had reading fluency skills at the ninth grade level, math fluency skills at the third grade level, letter-word identification skills at the tenth grade level, and spelling skills at the sixth grade level. (*Id.*). Plaintiff was placed in a regular classroom and received accommodations such as test questions read aloud, small group administration, extended time, breaks as-needed, and the availability of an intervention specialist. (Tr. 196). Plaintiff also had these accommodations while completing the Ohio Graduation Tests. (Tr. 199). Plaintiff's most recent IEP from 2013 reveals that she enrolled in the Allied Health program at Scioto County Career Technology Center to seek eventual employment in the medical field. (Tr. 236). Plaintiff's needs and weaknesses were "addressed through the extension of deadlines for assignments and exams and specially designed instruction to improve reading decoding and comprehension and math computation." (Tr. 236). She excelled in lab courses and required minimal assistance from the lab instructor. (*Id.*). Plaintiff's reading fluency skills were noted to be below average, but she had increased word recognition and comprehension with instructor and tutor assistance. (*Id.*). Plaintiff, however, passed none of her Ohio Graduation Tests. (Tr. 238). The most recent test results from the Scantron Performance Series indicate that plaintiff had reading skills at the sixth grade level as of October 2012 and math skills at the fourth grade level as of January 2013. (*Id.*).

Plaintiff cites to other evidence in the record which purportedly demonstrates that her IQ score of 59 is consistent, including the Woodcock-Johnson III Normative Update Test of Achievement administered on April 17, 2012, which indicated that plaintiff performed below average in six other tested areas; the Scantron Performance series, which indicated that plaintiff performed reading at a sixth grade level and math at a fourth grade level when she was in the

tenth and eleventh grades; and the Ohio Graduation Tests, which plaintiff never passed even though the tests were read aloud to her and she was given extended time to complete them. (Doc. 11 at 5-6). Plaintiff also argues that the ALJ erred in failing to consider that plaintiff passed none of her OGTS. However, as explained above, the ALJ did consider plaintiff's performance on the Scantron Performance Series and further considered other performance results as reflected in her 2012 and 2013 IEPs. Plaintiff has not shown how the evidence she cites is consistent with an IQ score of 59. Even where substantial evidence would support a different conclusion or where a reviewing court would have decided the matter differently, the ALJ's decision must be affirmed if it is supported by substantial evidence. *See Her v. Commissioner*, 203 F.3d 388, 389 (6th Cir. 1999). Moreover, the ALJ is not required "discuss every piece of evidence in the record for [her] decision to stand." *Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004). Although plaintiff argues that many of the school records were not completed by acceptable medical sources, the ALJ was entitled to balance all relevant evidence in the record in determining whether plaintiff met Listings 112.05 and 12.05. *See* Social Security Ruling, 06–03p, 2006 WL 2329939, at *6 (Aug. 9, 2006).

Plaintiff's argument that the ALJ erred in adopting the state agency consultants' opinions on her IQ score is also not well-taken. Plaintiff argues that "neither expert had the entire record before them" and "only point to the WRAT-4 subtest scores as being inconsistent with the FSIQ." (Doc. 11 at 6). Plaintiff explains that the WRAT-4 subtest scores represent that plaintiff's math scores were within the first percentile, while the other results varied from the fifth to thirtieth percentiles. (*Id.*). Contrary to plaintiff's argument, the state agency consultants considered many factors when discounting her IQ score, including the WRAT-4 subtest scores evaluated by Dr. Bodin. (Tr. 89, 341). Drs. Rudy and Stroebel cited to plaintiff's 2004 IQ

19

results and her 2012 IEP, which they noted as showing that plaintiff had low average scores in academic skills and lower skills in math. (Tr. 89). These psychologists also considered plaintiff's IEP showing that she was taught in the regular classroom with intervention assistance upon request and that she took her OGTs with accommodations. (*Id.*). These psychologists also considered that plaintiff "was cooperative with testing but gave up easily" during Dr. Bodin's evaluation. Plaintiff points out that "neither expert had the entire record before them." (Doc. 11 at 6). However, "[t]here will always be a gap between the time the agency experts review the record . . . and the time the hearing decision is issued. Absent a clear showing that the new evidence renders the prior opinion untenable, the mere fact that a gap exists does not warrant the expense and delay of a judicial remand." *See Kelly v. Comm'r of Soc. Sec.*, 314 F. App'x 827, 831 (6th Cir. 2009). Plaintiff has not pointed to any evidence that the state agency consultants failed to review, nor has she shown how the ALJ erred in adopting the opinion of Drs. Rudy and Stroebel that her IQ score of 59 was invalid.

Plaintiff also argues that the ALJ erred in considering her IQ score from March 2004 when she was eight years old because it is not "sufficiently current" as required by the regulations. (Doc. 11 at 6, citing Listing 112.05(D)(10)). However, the ALJ did not rely on the 2004 IQ score to discount plaintiff's IQ score of 59. Instead, the ALJ conducted a thorough review of plaintiff's most recent test scores and IEPs to discount her IQ score of 59 for the purposes of determining whether she met the listings for intellectual disability. The ALJ's determination that plaintiff's most recent scores were inconsistent with an IQ score of 59 is substantially supported by the record. Accordingly, for the above stated reasons, plaintiff's first assignment of error should be overruled.

## 2. Whether the ALJ erred in determining plaintiff has less than marked limitations in all six domains pursuant to 20 C.F.R. § 416.926a[3]

Plaintiff argues that the ALJ erred in determining whether her impairments functionally equaled Listing 112.05. (Doc. 11 at 9). In the domain of "acquiring and using information," plaintiff argues that the ALJ erred in considering her test results. (*Id.* at 10). Specifically, plaintiff argues that her "various other test scores if converted to IQ points would all be more than two standard deviations (less than 70%) below the norm in the domain of acquiring and using information." (*Id.*). In the domain of "attending and completing tasks," plaintiff argues that the ALJ erred in stating that plaintiff's extensions of time were never to exceed scheduled class time, when the accommodation was "not to exceed the schedule of the school day. . . ." (*Id.*). Plaintiff argues that the ALJ "harps on the lab testing," but fails to mention deficiencies in all other subjects. (*Id.*). Plaintiff also argues the following in regard to the ALJ's consideration of her test scores:

> The ALJ does not mention impaired attention and response inhibition on the CPT-2 (Conners Continuous Performance 2nd) Impaired focused attention and processing speed on the D-KEFS (Delis-Kaplam Executive Function System) subtest and below average spatial planning on the Drexel Tower of London(PAGEID#378). No mention was made of the processing speed Index of 59 (PAGEID#378). Assuming a scale similar to the rest of the WAIS-IV this would be more than three standard deviations from the norm and therefor [sic] an extreme limitation. This would be confirmed by processing speed subtest scores of 1 for symbol Search and 4 for Coding with a mean of 10 and an average range of 8-11(id).

(*Id.* at 10-11).[4]

---

[3] Although plaintiff states in the heading of her assignment of error that the ALJ erred in concluding that plaintiff has "less than marked limitations in all six domains," she only argues that the ALJ erred in the domains of "acquiring and using information" and "attending and completing tasks." (Doc. 10 at 10-11). Because "arguments adverted to in only a perfunctory manner, are waived," *see Kuhn v. Washentaw County*, 709 F.3d 612, 624 (6th Cir. 2013), the Court will solely consider these two asserted domains.

[4] Plaintiff attaches *M.A.M. v. Barnhart*, No. 05-6295, 2006 U.S. Dist. LEXIS 49076 (E.D. Pa. July 18, 2006), for the Court's review, but provides no explanation in support as to why this case applies here.

The Commissioner responds that "[p]laintiff's evaluation of her own test scores do not have a basis in the record; rather, they are her own lay interpretation of these scores." (Doc. 12 at 10). The Commissioner contends that no source has interpreted the results of plaintiff's tests in a way that plaintiff argues. (*Id.*). The Commissioner argues: "[t]here is no indication from this record, or other testing results in the record, that medical sources assessed Plaintiff as two or more standard deviations below the mean. . . . Plaintiff's interpretation of these test results is simply her lay opinion." (*Id.*).

The ALJ determined that before attaining age 18, plaintiff had "less than marked" limitations in acquiring and using information and attending and completing tasks. (Tr. 24-25). The domain of "acquiring and using information" involves how well children perceive, think about, remember, and use information in all settings, including their daily activities at home, at school, and in the community. *See* 20 C.F.R. § 416.926a(g) and SSR 09-3p. School-age children like plaintiff "should be able to learn to read, write, and do math, and discuss history and science." 20 C.F.R. § 416.926a(g)(2)(iv). They "will need to use these skills in academic situations to demonstrate what [they] have learned; e.g., by reading about various subjects and producing oral and written projects, solving mathematical problems, taking achievement tests, doing group work, and entering into class discussions." *Id.* Examples of limitations in this domain include: (1) not demonstrating understanding of words about space, size, or time; e.g., in/under, big/little, morning/night; (2) being unable to rhyme words or the sounds in words; (3) having difficulty recalling important things learned in school the day before; (4) having difficulty solving mathematics questions or computing arithmetic answers; (5) talking only in short, simple sentences and having difficulty explaining concepts; (6) not reading, writing, or doing arithmetic at appropriate grade level; and (7) having difficulty understanding instructions. 20 C.F.R. §

22

416.926a(g)(3) and SSR 09-3p.  The domain of "attending and completing tasks" involves how well a child is able to focus and maintain attention and how well she begins, carries through, and finishes her activities, including the pace at which she performs activities and the ease with which she changes them.  20 C.F.R. § 416.926a(h).  If a child has "marked" limitations in two domains of functioning or an "extreme" limitation in one domain, she has a severe impairment or combination of impairments which results in limitations that functionally equal the listings.  20 C.F.R. § 416.926a(a).  A "marked" limitation is defined as:

> [Y]our impairment(s) interferes seriously with your ability to independently initiate, sustain, or complete activities. Your day-to-day functioning may be seriously limited when your impairment(s) limits only one activity or when the interactive and cumulative effects of your impairment(s) limit several activities. "Marked" limitation also means a limitation that is "more than moderate" but "less than extreme."  It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean.

20 C.F.R. § 416.926a(e)(2)(i).

The ALJ's conclusion that plaintiff's impairments do not functionally equal a listing is supported by substantial evidence.  With regard to acquiring and using information, the ALJ noted that "though assessments do indicate difficulties with academic skills, the overall record does not suggest the [plaintiff] has a marked limitation."  (Tr. 24).  The ALJ noted that despite allegations included in the record, her Scantron Performance Series for Reading assessment revealed that she read at the sixth grade level at age seventeen.  (*Id.*).  The ALJ also noted that plaintiff had accommodations in a general classroom and her most recent IEP indicated that she responded well to adjustments in instruction to facilitate her reading comprehension and demonstrated increased word recognition and comprehension with instructor and tutor assistance.  (*Id.*).  Plaintiff earned above average grades in Allied Health labs and could navigate

23

a variety of computer programs.  (*Id.*).  Other than citing to plaintiff's IQ score and stating that

plaintiff's "various other test scores if converted to IQ points would all be more than two

standard deviations below the norm" (and thus arguably constitute a marked limitation), plaintiff

does not cite to any additional evidence that the ALJ failed to consider in determining that she

had a "less than marked" limitation in this domain.  Nor has plaintiff cited to an opinion from a

medical source indicating that she has greater limitations in this domain or that her various test

scores in fact fall two standard deviations below the norm in this domain.  Moreover, the opinion

of the state agency consultants, who also determined that plaintiff has "less than marked"

limitations in acquiring and using information, provides further support for the ALJ's

determination.  *See Lee v. Comm'r of Soc. Sec.*, 529 F. App'x 706, 713 (6th Cir. 2013) (opinions

of state agency consultants may be entitled to significant weight when they are supported by

substantial evidence) (citing 20 C.F.R. § 404.1527(e)(2)(i)).

Likewise, the ALJ's determination that plaintiff had "less than marked" limitations in the

domain of attending and completing tasks is supported by substantial evidence.  The ALJ noted

that accommodations included in plaintiff's IEPs addressed her difficulties with attention and

concentration.  (Tr. 25).  The ALJ also explained that in plaintiff's most recent IEP, she was

noted to be doing well with some accommodations and could work independently in groups as

well as complete assignments with minimal tutor assistance.  (*Id.*, citing Tr. 236).  The ALJ also

cited to Dr. Bodin's assessment, which advised that plaintiff be given more independence with

regard to activities of daily living.  (*Id.*, citing Tr. 339-43).  As described above, plaintiff has not

cited to any evidence or a medical opinion showing that her limitations are greater than the ALJ

assessed in the domain of attending and completing tasks.  Plaintiff takes issue with the fact that

the ALJ did not discuss certain test results included in Dr. Bodin's assessment, including the

24

processing speed index score of 59, as well as plaintiff's performance on the tests measuring her attention and executive functions.  (Doc. 11 at 10-11, citing Tr. 340, 341).  Plaintiff argues that these scores would equal "three standard deviations from the norm" and therefore should be considered an "extreme limitation" for purposes of determining whether her mental impairments functionally equal a listing.  (*Id.* at 11).  However, plaintiff has not cited to any medical source determining that she has greater limitations in the area of attending and completing tasks than the ALJ assessed, nor has she provided the Court with an opinion from a medical source demonstrating that her test scores in this domain are in fact three standard deviations from the norm and therefore considered extreme limitations under the regulations.  Plaintiff's assertion in this regard amounts to no more than her own lay opinion.

Plaintiff also criticizes the fact that the state agency consultants did not offer an opinion on the "validity of the above scores."  (*Id.* at 11).  As noted above, there is no requirement that these psychologists review a complete and comprehensive record and a plaintiff must make a clear showing that new evidence renders the prior opinion untenable.  *See Kelly*, 314 F. App'x at 831.  Nor is there a requirement that the ALJ cite to every piece of evidence in the record, especially where, as here, plaintiff has not shown how these test scores provide greater limitations in the domain of attending and completing tasks.  Accordingly, for the above stated reasons, plaintiff's second assignment of error should be overruled.

### 3. Whether the ALJ erred in refusing to order additional expert testimony or consultative examinations

In her third assignment of error, plaintiff argues that the ALJ erred in not ordering additional expert testimony.  (Doc. 11 at 12).  Plaintiff states: "the regulations for analysis of the domains require a determination of whether or not certain test scores are two or three standard

25

deviations below the norm and the only time relevant objective test scores are those contained in Professor's [sic] Bodin's report." (*Id.*).  Plaintiff also contends that the IEPs relied on by the state agency experts are "based on no known acceptable medical source and no indication that it was based on their own observations and contains little if any information."[5] (*Id.* at 13).  Plaintiff further argues that the ALJ erred in failing to recontact Dr. Bodin or any supplying source for clarification.  (*Id.*).

The Commissioner responds that that the ALJ had no duty to recontact Dr. Bodin or order additional testing.  (Doc. 12 at 11).  The Commissioner argues that the ALJ had discretion in determining whether additional evidence was necessary and that the ALJ had sufficient evidence before her to evaluate the validity of plaintiff's IQ score.  (*Id.*).

Although an ALJ has an affirmative duty to ensure that every claimant receives a "full and fair hearing," the ultimate burden of establishing disability lies with a clamant.  *Lashley v. Sec'y of Health and Human Servs.*, 708 F.2d 1048, 1051 (6th Cir. 1983) (citing *Richardson*, 402 U.S. at 401.  *See also Sims*, 530 U.S. at 110-11 (although the claimant bears the ultimate burden of establishing that he is entitled to disability benefits, courts have recognized that social security proceedings are "inquisitorial rather than adversarial," and it is the ALJ's duty to investigate the facts and develop arguments both for and against granting benefits).  However, an ALJ is not required to call a medical expert.  *Harrison v. Astrue*, No. 1:11-cv-117, 2012 WL 130880, at *11 (N.D. Ohio Jan. 3, 2012), *adopted*, 2012 WL 135659 (N.D. Ohio Jan. 17, 2012).  Where the record contains sufficient evidence for an ALJ to decide a disability claim absent expert medical testimony, a failure to solicit expert medical testimony will not serve as a basis to reverse an

---

[5] The Court rejected this argument at *supra* page 19.

ALJ's decision. *Id.* (citing *Williams v. Callahan*, No. 97-3601, 1998 WL 344073, *4 n. 3 (6th Cir. 1998)).

In this case, the ALJ was under no duty to call a medical expert to evaluate plaintiff's IQ score or other test scores. Here, the record contained sufficient evidence for the ALJ to have decided plaintiff's disability claim. For example, in addition to the test scores scattered throughout the record, the record included sufficient evidence regarding plaintiff's academic performance, her IEPs, and the medical opinions from the state agency consultants. Plaintiff has not shown how the failure to call an expert constitutes reversible error nor has she shown how additional experts would further substantiate her claims.

Plaintiff's argument that the ALJ was required to recontact Dr. Bodin for additional information on his evaluation and assessment of plaintiff's IQ score is also not well-taken. The regulation in effect at the time of the ALJ's decision specified that recontacting a medical source is permissive, not mandatory, where there is insufficient evidence to make a disability decision. *See* 20 C.F.R. § 416.920b(c)(1). ("We *may* recontact your treating physician, psychologist, or other medical source.").[6] Here, the evidence before the ALJ was not insufficient and there was no reason for the ALJ to recontact Dr. Bodin regarding his February 2013 evaluation. Accordingly, plaintiff's third assignment of error should be overruled.

### 4. Whether the ALJ erred in weighing the medical opinions

In her final assignment of error, plaintiff argues that the ALJ improperly weighed the medical opinions of record. (Doc. 11 at 13). Plaintiff argues that the ALJ failed to properly weigh the opinion of Dr. Bodin because his opinion is "supported by detailed, clinical, diagnostic

---

[6] Effective March 27, 2017, the regulation was amended and again provides that recontacting a medical source is permissive and not mandatory. 20 C.F.R. § 416.920b(b)(2)(i) ("[w]e may recontact your medical source.").

evidence; and substantial acceptable medical evidence to the contrary does not exist in the record." (*Id.*). Plaintiff argues that Dr. Bodin's opinion is consistent with her testimony, her placement in special education, irregular brain activity as demonstrated by her MRI, problems at birth, malformations of the brain, and her nurse practitioner's referral for a neuropsychiatric evaluation. (*Id.* at 13-14). Plaintiff also argues that since she was referred to Dr. Bodin by her treating nurse practitioner, Deborah Terry, it should be given controlling weight under the treating physician rule. (*Id.* at 14).

The Commissioner responds that the ALJ reasonably reviewed the evidence and appropriately weighed the opinions of the medical sources. (Doc. 12 at 5). The Commissioner argues that the ALJ reasonably gave "great weight" to the opinions of the state agency consultants, who also questioned the validity of plaintiff's IQ score recorded by Dr. Bodin. (*Id.* at 5-6). The Commissioner contends that plaintiff's argument considering Dr. Bodin to be a "treating source" is nonsensical because he evaluated her only on one occasion. (*Id.* at 7). The Commissioner also maintains that the ALJ gave Dr. Bodin's opinion "some weight" as it was "consistent with some evidence in the record, such as parts of Plaintiff's IEPs, but [the ALJ] did not fully rely on this assessment because Plaintiff's IEPs showed greater functionality than assessed by Dr. Bodin." (*Id.*).

In assessing whether plaintiff functionally equaled the listings, the ALJ afforded "great weight" to the opinions of the state agency consultants, who found plaintiff to have less than marked limitations in the domains of functioning. (Tr. 22). The ALJ noted that their assessments were consistent with the record and their assessments cited to specific examples suggesting greater functionality than alleged by plaintiff. (*Id.*). The ALJ noted that these consultants questioned the full scale IQ score recorded by Dr. Bodin based on the records of

plaintiff's academic performance. (*Id.*). Nevertheless, the ALJ afforded the mental assessment of Dr. Bodin "some weight," noting that his assessment was based on direct examination of plaintiff and aligned with some of the accommodations in the IEPs in the record. (Tr. 23). The ALJ also noted that plaintiff's IEPs suggest greater functionality than assessed by Dr. Bodin and suggest that plaintiff benefits from fewer accommodations. (*Id.*).

Plaintiff essentially argues that the ALJ erred by not following the general rule that more weight is given to examining sources over nonexamining sources. While "the opinions of nontreating [examining] sources are generally accorded more weight than nonexamining sources, it is not a per se error of law, as [plaintiff] suggests, for the ALJ to credit a nonexamining source over a nontreating source. Any record opinion, even that of a treating source, may be rejected by the ALJ when the source's opinion is not well supported by medical diagnostics or if it is inconsistent with the record." *Norris v. Comm'r of Soc. Sec*., 461 F. App'x 433, 439 (6th Cir. 2012) (citing 20 C.F.R. §§ 404.1527, 416.927; *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d at 504, 514 (6th Cir. 2010)). The ALJ's decision to credit the opinions of the state agency consultants over Dr. Bodin is substantially supported by the record. The ALJ reasonably concluded that portions of Dr. Bodin's assessment, including the IQ score as discussed above, were inconsistent with the evidence of record and she adequately explained the weight given to his assessment. The ALJ cited to instances in the record, particularly plaintiff's IEPs, demonstrating that Dr. Bodin's assessment was not entirely supported. Nevertheless, the ALJ afforded his assessment "some weight" and concluded that portions of it were supported by the record.

Plaintiff's argument that the treating physician rule should apply and therefore Dr. Bodin's assessment should be given controlling weight is misguided. "The treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant

29

and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has only seen the claimant's medical records." *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994).  Dr. Bodin is not considered a treating physician based on his one-time evaluation of plaintiff and referral from plaintiff's treating nurse practitioner, Deborah Terry.  As an initial matter, Ms. Terry herself is not considered a treating physician or acceptable medical source under the regulations. *See* SSR 06-03p, 2006 WL 2329939, *2 (Under the regulations and rulings applicable to plaintiff's claim, only "acceptable medical sources" as defined under former 20 C.F.R. § 416.913(a)[7] can provide evidence which establishes the existence of a medically determinable impairment, give medical opinions, and be considered treating sources whose medical opinions may be entitled to controlling weight).[8]  Moreover, the record contains no opinion from Ms. Terry on Dr. Bodin's one-time evaluation.  Accordingly, the Court finds that the ALJ properly weighed the medical opinions and plaintiff's final assignment of error should be overruled.

**IT IS THEREFORE RECOMMENDED** that the decision of the Commissioner be **AFFIRMED** and this case be closed on the docket of the Court.

Date:  __2/12/18_____          ___*/s/ Karen L. Litkovitz*_____
                                           Karen L. Litkovitz
                                           United States Magistrate Judge

---

[7] Former § 416.913 was in effect until March 27, 2017, and therefore applies to plaintiff's claim filed in 2013.  For claims filed on or after March 27, 2017, all medical sources, not just acceptable medical sources, can make evidence that the Social Security Administration categorizes and considers as medical opinions.  82 FR 15263-01, 2017 WL 1105348 (March 27, 2017).

[8] SSR 06-3p has been rescinded in keeping with amendments to the regulations that apply to claims filed on or after March 27, 2017, and the rescission is effective for claims filed on or after that date.  82 FR 15263-01, 2017 WL 1105348 (March 27, 2017).  Because plaintiff's claim was filed before the effective date of the rescission, SSR 06-3p applies here.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

MAKALA HAMMONDS,                                    Case No. 1:17-cv-100
          Plaintiff,                                Dlott, J.
                                                    Litkovitz, M.J.


          vs.


COMMISSIONER OF
SOCIAL SECURITY,
          Defendant.

<b>NOTICE</b>

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of

the recommended disposition, a party may serve and file specific written objections to the

proposed findings and recommendations.  This period may be extended further by the Court on

timely motion for an extension.  Such objections shall specify the portions of the Report objected

to and shall be accompanied by a memorandum of law in support of the objections.  If the Report

and Recommendation is based in whole or in part upon matters occurring on the record at an oral

hearing, the objecting party shall promptly arrange for the transcription of the record, or such

portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the

assigned District Judge otherwise directs.  A party may respond to another party's objections

**WITHIN 14 DAYS** after being served with a copy thereof.  Failure to make objections in

accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn*, 474 U.S. 140

(1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).